UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-11009-RGS

DAVID GRISHMAN, REDROCK LITERARY, LLC,
and PINK SAND PRESS, LLC

v.

MARCI CLARK

MEMORANDUM AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

May 31, 2023

STEARNS, D.J.

David Grishman, literary agency RedRock Literary, LLC (RedRock), and publishing company Pink Sand Press, LLC (Pink Sand), brought this lawsuit against a client author, defendant Marci Clark.  Plaintiffs seek to hold Clark liable for the alleged breach of her Literary Agency and Representation Agreement (LAA) with RedRock and her Publishing Agreement (PA) with Pink Sand.  Clark counterclaimed, alleging that Grishman and RedRock breached the fiduciary duty they owed to her as her agents.  Clark also claims that Pink Sand breached the PA by failing to reimburse her for auditing costs and by withholding royalty payments.[1]  Plaintiffs now move for summary

---

[1] This summary omits several claims and counterclaims that were dismissed by the court and voluntarily dismissed by the parties.  *See*

judgment on their breach of the LAA claim and on all of Clark's counterclaims.  Clark cross-moves for summary judgment on the same claims, as well as on plaintiffs' breach of the PA and breach of the implied covenant of good faith and fair dealing claims.[2]

## BACKGROUND

Clark is an author of romance novels and other genres targeted to a female readership.  Prior to signing with RedRock, Clark had successfully published with other publishing houses.  On December 3, 2018, Clark entered the LAA with RedRock and engaged Grishman, RedRock's founder and president, as her literary agent.  Acting in that capacity, Grishman contacted Jeanne De Vita, who is also a friend of Clark, to ask whether she knew of any publishers who would be interested in Clark's work.  De Vita suggested Pink Sand, a newly-formed publishing house for which she worked as a developmental editor.  On December 9, 2018, De Vita sent Grishman a proposed PA for Pink Sand's acquisition of the rights to Clark's titles.

---

8/4/2022 Order [Dkt # 33]; Stipulation of Dismissal of Select Claims [Dkt # 66].  Additionally, Clark originally brought a third-party complaint against Steven Grishman, but he has since been dismissed as a party.

[2] Clark moves for "partial" summary judgment.  But the court cannot identify the partial relief Clark requests, with Clark having moved for summary judgment on all claims and counterclaims and not having limited her motion to certain issues of any claim.

Unbeknownst to Clark at the time, Grishman's father, Steven Grishman, is the CEO and owner of Pink Sand.[3]

Under the PA, Clark committed to produce six novels in her *The Women of the Hearts* series (*Hearts* series). When she signed the PA, Clark had already drafted the first three books in the *Hearts* series. The PA specified deadlines for Clark by which she was to submit the three draft novels for substantive developmental editing. She was also given deadlines for books four through six in the *Hearts* series. Clark also agreed to produce a fiction series entitled *A Life Without Water* (*Life Without* series) under the PA.

The PA laid out the editing sequence between Clark and Pink Sand. Clark was to deliver a copy of each manuscript by the agreed-upon deadline. Pink Sand would then determine whether the manuscript was "acceptable . . . in content and form." PA [Dkt # 1-3] ¶ 2(a). If Pink Sand found a manuscript deficient, it would provide Clark with a written request for changes and revisions. Clark would then have thirty days to submit a revised manuscript. *See id.* Once Pink Sand accepted a manuscript, it would have a

---

[3] To avoid confusion between David Grishman and Steven Grishman, the court will refer to David as "Grishman" and Steven as "Steven Grishman."

twelve-month window in which to publish the book.  Royalties were to be paid on a quarterly basis to Clark based on a percentage of her book sales.

The proposed PA set Clark's royalty rate at 15%.  Clark told De Vita that "the 15% [was] a bit of a gut punch" even though she "kn[e]w it's an industry standard."  Clark/De Vita Messages [Dkt # 62-2] at 10.  Clark also asked De Vita whether the contract term would be three or five years in duration, to which De Vita responded that she had told Grishman no more than five years.  *Id.*  De Vita also told Clark that if there were any terms of the PA that she was unhappy with, she should "push back" accordingly.  *Id.*

During the negotiations, Grishman asked Pink Sand whether the contract term was flexible and whether Pink Sand would be amenable to a term of seven or eight years.  On December 17, 2018, De Vita gave Grishman a term sheet for Clark, proposing a ten-year contract.  Neither Clark nor Grishman pushed back on the term length.  Grishman also requested either an increased royalty rate or a bonus structure for Clark, the latter of which Clark accepted.

On January 23, 2019, Clark entered the PA with Pink Sand.  She shortly thereafter learned that Steven Grishman was David Grishman's father.  Clark stated that she was concerned about Grishman's potential conflict of interest, but she did not terminate the agency or the contract.  After the PA was signed,

Grishman began to work directly for Pink Sand.   Clark and Grishman amended the LAA so that his compensation under the LAA would be reduced to 0% to account for the shift.

Pink Sand began promoting Clark's work, ultimately spending some $1.4 million on the marketing and promotion of her titles.   Accounting Sheet [Dkt # 58-15].   Clark's social media following and readership grew significantly as a result.   *See* Clark Dep. [Dkt # 58-1] at 48-50.   After contracting with Pink Sand, Clark earned over $48,000 annually in royalties in 2020 and 2021, a significant increase from the less than $500 in annual royalties she had earned from 2016 to 2018.   Clark Compensation Graph [Dkt # 58-4] at 5-6.

In October of 2019, Clark submitted the manuscript for the fourth book in the *Hearts* series, entitled *Secret Hearts*.   Pink Sand's editors, including De Vita, found the manuscript unacceptable and requested substantial revisions.   After receiving a revised version in January of 2020, De Vita told Grishman that the manuscript remained unacceptable.   According to plaintiffs, in February of 2020, Grishman, his father, De Vita, and Clark participated in a phone call in which Clark stated that she was no longer interested in authoring the *Hearts* series and agreed to have De Vita ghostwrite the remaining three books, including *Secret Hearts*.   Clark states

that she only agreed to cede the series to De Vita because Grishman advised her that the PA allowed Pink Sand to implement the ghostwriting arrangement without her consent.

In March of 2020, Clark told Pink Sand that she objected to the use of a ghostwriter.  To accommodate her objection, Pink Sand agreed with Clark to execute an amendment to the PA extending the deadlines for the remaining two books in the *Hearts* series.  The amendment also stipulated that Clark would create a new series, the *Chammont Point* series, for Pink Sand to publish.

In February of 2021, Pink Sand and Clark executed a second amendment to the PA after she completed the *Life Without* series.  The new amendment set deadlines for the second and third installments of the *Chammont Point* series.  The third installment of that series, *The Breaking Point*, was due on August 18, 2021.  Clark also agreed to deliver new concepts for Pink Sand's future publication by May 15, 2021.

On May 17, 2021, Clark submitted a concept for a three-book romance series called *Treehouse Club*.  Pink Sand's editors found the proposed series deficient in several respects.  Clark withdrew the *Treehouse Club* concept on June 7, 2021, and did not propose a substitute.

On August 20, 2021, Clark's attorney, Timothy Zarley, told Grishman that Clark would deliver *The Breaking Point* to Pink Sand on September 24, 2021, rather than on August 18 as specified in the second amendment to the PA. The parties dispute whether Pink Sand agreed to the extension. On September 15, 2021, Pink Sand sent a notice of default to Clark. Pink Sand also escrowed Clark's quarterly royalty payments. In response, Clark entrusted the completed manuscript to Zarley.

On December 15, 2021, Clark sued the plaintiffs in the United States District Court for the Southern District of Iowa for breach of contract, breach of fiduciary duty, and fraudulent concealment. After Clark voluntarily dismissed the Iowa action on January 24, 2022, the plaintiffs filed suit in this court.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d

731, 735 (1st Cir. 1995) (citation omitted).  "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## I.   Count I: Breach of the PA for Failure to Meet Deadlines

Plaintiffs' first claim is that Clark breached the PA by failing to meet several of her obligations: (1) the timely submission of an acceptable revision of *Secret Hearts* and the two remaining books in the *Hearts* series or ceding the task to a ghostwriter;  (2) the proposal of two to three new concepts for publication by May 15, 2021; and (3) the August 18, 2021 manuscript delivery deadline for *The Breaking Point*.[4] Am. Compl. [Dkt # 38] ¶¶ 47-52, 66, 74.

---

[4] As Clark points out, it is not entirely clear what the plaintiffs are alleging as discrete breaches of the PA and what they have instead included in the Complaint for narrative effect. *See, e.g.*, Am. Compl. ¶¶ 54-55 (alleging that Clark was "materially late" in meeting her deadlines and rescinded her agreement to use a ghostwriter, even though Pink Sand had "cooperated" by amending the PA); *id.* ¶ 59 (alleging that Clark's *Hearts* series was left incomplete "by the consent of both parties" and "Pink Sand obliged Clark" to do so); *id.* ¶¶ 60-63 (alleging that Clark's *Selling Point* manuscript was unacceptable but noting that Pink Sand "grant[ed] Clark to June 4, 2021" to complete the proposed changes).

Clark now seeks summary judgment on this count. Clark does not address her failure to provide new concepts as required in the first amendment to the PA. *See* Def.'s Mem. in Supp. of Summ. J. (Def.'s Mem.) [Dkt # 60] at 17-18 (omitting discussion of this obligation). She likewise does not discuss her obligation to submit an acceptable version of *Secret Hearts* on time in the context of the breach of contract allegation. *Id.* (omitting discussion of *Secret Hearts* in breach of PA section). However, Clark does argue that she did not breach the PA in the last instance because the parties had agreed by phone to amend the deadline to September 24, 2021. *See id.* at 18.

The plaintiffs dispute that they granted such an extension, and the only evidence that this conversation took place is Clark's declaration and an email correspondence between Clark and Grishman. *See* Clark Decl. [Dkt # 62-10] ¶ 7; Grishman Produc. Excerpts [Dkt # 62-1] at 10. Further, Clark offers no evidence of a signed written agreement to modify the PA's deadlines, which

---

Plaintiffs respond by simply stating "[t]he Amended Complaint recites multiple breaches by Defendant . . . and the two amendments to the PA." Pls.' Opp'n [Dkt # 68] at 10. To the extent that the plaintiffs intended to allege additional breaches, the plaintiffs have failed to allege specific facts enabling the court to identify them. *See Morales-Tañon v. P.R. Elec. Power Auth.,* 524 F.3d 15, 18 (1st Cir. 2008) (plaintiff's factual allegations must be sufficient to "raise a right [to] relief above the speculative level") (internal quotation marks omitted).

is required by the PA itself. *See* PA ¶ 16(h) ("No waiver or modification of any provision of this Agreement shall be valid unless in writing and signed by both parties.").[5] Viewing the evidence in the light most flattering to the non-moving party, Clark has not met her burden of establishing that there is no dispute of fact over whether she missed her submission deadline for *The Breaking Point*. Consequently, the court will deny Clark's motion for summary judgment on the claims under Count I.

Finally, Clark argues that while she timely completed *The Breaking Point*, she placed it in escrow with her attorney in response to Pink Sand's withholding of her royalties. Plaintiffs do not dispute this. Pls.' Resp. to Def.'s Statement of Facts [Dkt # 69] ¶ 120. The propriety of Clark's resort to self-help in this regard cannot be resolved independently of the alleged reciprocal breaches of the PA which are in dispute.

## II.    Count II: Breach of the LAA

Next, the parties cross-move on plaintiffs' claim for the legal fees they incurred in defending the Iowa litigation. Plaintiffs argue that the LAA required Clark to attempt to resolve any disputes through arbitration, and if unsuccessful, to file suit only in Massachusetts.

---

[5] Clark cites an email she sent Grishman listing *The Breaking Point* as due on September 24, but Grishman did not explicitly assent to the deadline. *See* Grishman Produc. Excerpts at 10.

The court first must determine whether the LAA forum selection clause is permissive or mandatory. A permissive forum selection clause "authorize[s] jurisdiction and venue in a designated forum, but do[es] not prohibit litigation elsewhere." *Rivera v. Centro Medico de Turbado, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009), citing 14D Wright, Miller & Cooper, Federal Practice and Procedure § 3803.1 (3d ed. 1998). A mandatory forum selection clause, by contrast, "contain[s] clear language indicating that jurisdiction and venue are appropriate exclusively in the designated forum." *Id.*

A forum selection clause conferring jurisdiction in a given forum but not specifying that it is exclusive will be treated as permissive. *Boland v. George S. May Int'l Co.*, 81 Mass. App. Ct. 817, 823-824 (2012). However, "words are not viewed in isolation within a contract," and a qualifying phase preceding the forum selection language can inform the court's interpretation of the clause even where the language in isolation does not explicitly say jurisdiction is exclusive. *Rivera*, 575 F.3d at 17-18, quoting *McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir. 2004).

Such a qualifying phrase exists in the LAA, which reads, "If the parties cannot come to an agreement [to settle their dispute], an independent arbitrator mutually agreed upon by both parties shall be appointed to make a decision which will be binding upon both parties. *If the Parties cannot*

*agree upon an arbitrator within thirty (30) days of a written arbitration request by either Party*, the Parties may pursue remedies in law or equity in any court within the Commonwealth of Massachusetts." LAA [Dkt # 1-2] § 14 (emphasis added). This qualifying phrase clarifies that only after the parties fail to agree on an arbitrator are they permitted to pursue litigation, and that if so, that the litigation take place in Massachusetts courts. It follows that the clause is mandatory. The First Circuit reached a similar conclusion in *Rivera*, holding that the qualifying phrase "*In the event that by act or omission I consider that physical, emotional or economic damages have been caused to me,* I expressly agree to submit" was a mandatory forum selection clause because the conditional statement made clear that the litigant had committed to assert any causes of actions in Massachusetts if the antecedent was met. *Rivera*, 575 F.3d at 18.

Having determined that the LAA forum selection clause is mandatory, the court will turn to whether plaintiffs can recoup their legal fees, and if so, whether such damages are merited here. This court, among others, has recognized that a party may recover attorneys' fees and costs incurred under a breach of contract theory when it is haled into an improper forum. *See, e.g.*, *Cognex Corp. v. Air Hydro Power, LLC*, 2023 WL 131395, at *4 (D. Mass. Jan. 9, 2023) ("Air Hydro is alleged to have breached a specific

contractual provision by filing suit in Florida.  The attorneys' fees and costs Cognex allegedly incurred in the Florida Action are the direct and primary result of that breach and Cognex could not have avoided them once Air Hydro initiated litigation in the purportedly improper forum."); *MPVF Lexington Partners, LLC v. W/P/V/C, LLC*, 148 F. Supp. 3d 1169, 1178 (D. Colo. 2015) (finding that litigant breached an agreement between the parties by filing action in Kentucky in contravention of forum selection clause).

By the plain language of the LAA, Clark breached the forum selection clause.  The clause required her to first seek to resolve her dispute in good faith and then attempt to resolve the dispute through arbitration.  *See* LAA § 14.  Only if the parties were not able to agree upon an arbitrator could she file suit in a Massachusetts court.  The record is undisputed that this is not the procedural order of events that occurred.  Clark filed a complaint in the United States District Court for the Southern District of Iowa on December 15, 2021.  *See* Iowa Compl. [Dkt # 1-6].  On January 13, 2022, Lawrence Green, plaintiffs' counsel, reminded Zarley that the LAA required that the parties attempt to resolve their dispute through arbitration first and requested a meeting to discuss the appointment of an arbitrator.[6]  Zarley

---

[6] Clark seemingly argues that the plaintiffs have unclean hands with respect to this claim because they did not provide a written request to arbitrate any dispute before filing this action.  Def.'s Mem. at 16.  Unclean

Emails [Dkt # 62-8] at 19.   On January 21, 2022, the parties agreed to arbitrate Clark's claims.   Def.'s Statement of Facts [Dkt # 61] ¶ 114.   On January 24, 2022, Clark dismissed her complaint in Iowa court.   *See* Iowa Compl. at 10.

Clark offers two responses for why this claim must be dismissed.   First, she argues that because she never served the plaintiffs in the Iowa matter, they had no obligation to respond.   It follows, she argues that any injury was not a result of any breach of the LAA but rather the plaintiffs' "unilateral decision to incur costs prior to any need or obligation to do so."   Def.'s Opp'n [Dkt # 67] at 15.   Second, Clark argues that the plaintiffs' alleged material breach of the LAA absolved her of any further obligation under the LAA because no contract existed by the time she filed in Iowa.

Neither argument is tenable.   Clark's first contention ignores the realities of litigation and contrary case law in this jurisdiction.   *See Hochen v. Bobst Grp., Inc.*, 198 F.R.D. 11, 15, 18 (D. Mass. 2000) (permitting a non-

---

hands is an equitable principle that "generally has no application to an action at law for breach of contract." *Saggese v. Kelley*, 445 Mass. 434, 444 (2005). Further, the record does not support this assertion. Prior to filing a complaint in this court on February 2, 2022, Green reached out to Zarley on January 21, 2022, to confirm whether Clark was agreeable to arbitration by January 24, 2022, and to agree upon an arbitrator. Litigation Email Correspondence [Dkt # 70-12] at 3. Zarley indicated that Clark was not prepared to agree to the plaintiffs' request to arbitrate the dispute in Massachusetts. *Id.* at 2.

party to recover attorneys' fees and costs where litigants had moved to add the non-party as a defendant and court had denied the motion); *see also Greenberg v. Sala*, 822 F.2d 882, 885 (9th Cir. 1987) ("The defendants were named as defendants in the complaint, however, the complaint was not served upon any of them . . . . The filing of the complaint, nonetheless, caused the defendants to incur costs and attorney fees."). This court is unwilling to deem the preparation of a responsive pleading after being named as a defendant in a lawsuit "a unilateral decision" only because service had not yet been effected. *See* Def.'s Opp'n at 15.

Clark's second argument runs counter to the holdings of federal courts who have considered the issue. *See, e.g.*, *Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 513 (1st Cir. 2020) ("When two parties commit to arbitrate disputes arising under a contract, they ordinarily mean to bind each other to arbitrate such disputes even if the grievant doesn't complain until after the contract expires."); *Friday & Cox, LLC, v. Findlaw*, 2018 WL 3912829, at *6 (W.D. Pa. Aug. 16, 2018) ("[Plaintiff] argues that the forum-selection clauses are unenforceable because defendants materially breached [their contract]. Other courts that have considered this issue, have held that a plaintiff's allegations that the defendant materially breached the contract containing the forum-selection clause do not render an otherwise

enforceable forum-selection clause unenforceable."); *Beaubois v. Accolade Constr. Grp., Inc.*, 2016 WL 94255, at \*1 (S.D.N.Y. Jan. 7, 2016) ("Courts . . . routinely enforce forum-selection clauses against plaintiffs alleging breach of contract.").  Further, it runs contrary to common sense.  Because a forum selection clause is typically implicated where there is a dispute amongst the parties about their contractual obligations, Clark's reasoning would negate the purpose of agreeing to one in the first place.

### III.   Count III: Breach of Implied Covenant of Good Faith and Fair Dealing

Clark also seeks summary judgment on plaintiffs' claim that she breached the implied covenant of good faith and fair dealing.  Plaintiffs allege that Clark failed to submit timely and acceptable manuscripts because she wanted to terminate her relationship with Pink Sand, not because of creative differences.  *See* Pls.' Opp'n at 15.  This failure, the plaintiffs contend, caused Pink Sand to incur lost profits and diminished returns for their investment in promoting Clark as an author.

"The duty of good faith and fair dealing concerns the manner of performance."  *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  The covenant reflects an implied condition that inheres in every contract "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of

16

the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-472 (1991).

Clark argues that the plaintiffs fail to meet their burden of showing that her actions were "motivated by a desire to destroy or injure Pink Sand's right to receive the fruits of the [PA]." Def.'s Mem. at 23. However, the standard is not as stringent as Clark would have it. There is no requirement that bad faith be shown; instead, plaintiffs have the burden of proving a lack of good faith. *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 189, 191 (2016). Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Hartford Accident & Indem., Co. v. Millis Roofing & Sheet Metal, Inc.,* 11 Mass. App. Ct. 998, 999-1000 (1981).

Clark cannot show that there is an absence of evidence to support the plaintiffs' position. They provide testimony from Grishman that, during the editing process, Clark "was failing to communicate," to "listen to guidance from Pink Sand," and to "jump on the phone and have a conversation." Grishman Dep. [Dkt # 70-1] at 123-124. Additionally, the plaintiffs point to email exchanges between De Vita and Grishman discussing Clark's failure to incorporate substantive edits in her revisions and the inclusion of the same mistakes across revisions. De Vita/Grishman Emails [Dkt # 70-4] at 2;

Grishman Dep. at 127-128.  In sum, these examples provide circumstantial support for plaintiffs' allegations that Clark refused to genuinely participate in the editing process with honest purpose.

Rather than engaging in the substance of the plaintiffs' allegations, Clark argues that Pink Sand was not deprived of the fruits of the PA because the PA did not require Pink Sand to publish any of Clark's allegedly late or unacceptable work, and it had the option of seeking to recover any of the advances it paid to Clark.  Def.'s Mem. at 24.  This argument misses the plaintiffs' point.  Plaintiffs do not argue that Clark's lack of good faith caused Pink Sand to lose Clark's advance payments or harmed Pink Sand by requiring it to publish Clark's work that it deemed subpar.  Rather, plaintiffs argue that Pink Sand invested over $1 million in promoting Clark with the expectation that it would recoup that investment in future book sales, and that Clark's unwillingness to complete her contractual obligations destroyed this opportunity.  *See* Pls.' Statement of Facts [Dkt # 65] ¶ 39; Pls.' Opp'n at 5-6; De Vita/Grishman/Clark Emails [Dkt # 70-5] at 2-3 ("I did explain that we are marketing and need to run ads.  These ads will lose money which is fine, as we know the next books are coming . . . .").  Plaintiffs provide an accounting sheet indicating Pink Sand's expenses with respect to Clark totaled $1,468,271.56 by September 28, 2022, and Clark does not contest

this.  Accounting Sheet.  Because Clark has not met her burden under the summary judgment standard, the court will deny her motion as to this claim as well.

## IV.  Counterclaim I: Breach of Fiduciary Duty

Both parties move for summary judgment on Clark's counterclaim that Grishman, and by extension RedRock, breached a fiduciary duty as Clark's literary agent by failing to disclose Grishman's conflict of interest at the time of her signing with Pink Sand in January of 2019.  Clark maintains that she would not have entered the PA with Pink Sand had she known that Grishman's father was an owner.  Clark also argues that Grishman breached his fiduciary duty by negotiating an unfavorable royalty and an extended contract term, by advising her that Pink Sand had the right to use a ghostwriter without her consent,[7] and by refusing to negotiate the removal of *Secret Hearts* from distribution.

Even if the actions described above constituted breaches of Grishman's fiduciary duty to Clark, there is ample support in the record supporting the proposition that Clark ratified any breach.  Ratification "eliminates claims

---

[7] Plaintiffs contest Clark's characterization of Grishman's conversation with her about using a ghostwriter for the *Hearts* series.  After Pink Sand found Clark's draft of *Secret Hearts* unacceptable, Grishman states that he advised her that to comply with the PA, which required her to submit an acceptable manuscript within a certain timeframe, she either must revise her work *or* use a ghostwriter.  *See* Grishman Dep. at 126.

that the principal has against the agent, including claims for breach of fiduciary duty." Restatement (Third) Of Agency § 4.02, cmt. c.   A principal may ratify the actions of an agent, even where the agent lacks actual authority, "if the principle acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 18 (1997).  A principal's retention of benefits from an agent's unauthorized act "for a considerable time after [s]he obtains full knowledge of the transaction" also serves to ratify the agent's act. *Kidder v. Greenman*, 283 Mass. 601, 616 (1933).  This is true even if the principal "manifests dissent to becoming bound by the act's legal consequences."  Restatement (Third) Of Agency § 4.01, cmt. d.

The record establishes that Clark had contemporaneous knowledge of each action she alleges to have constituted a breach of fiduciary duty.  It is undisputed that Clark learned that Grishman's father co-owned Pink Sand "quickly after" signing the PA in January of 2019, Clark Dep. at 133, yet remained a willing party to the agreement until Pink Sand declared Clark in default in September of 2021, even executing two amendments to the PA in the interim.  Clark argues that she voiced concerns after discovering the conflict of interest by consulting De Vita two weeks after learning of the relationship between Grisham and Pink Sand.  She asserts that De Vita told

her that she could not back out of the PA because Pink Sand had already invested money in her career.[8]  She also claims that she raised her concerns directly with Grishman,[9] who allegedly told her that he did not believe that a true conflict existed.  Whether or how she manifested dissent, it remains the fact that Clark chose to retain Grishman as her agent for over two years after learning of the alleged conflict.[10]

While Clark lodges several examples of how Grishman's alleged conflict of interest manifested, the record is replete with evidence that she acquiesced to the terms of the PA and accepted its fruits.  For example, despite Clark believing that Grishman should have done more to shorten the contract term, for years she accepted the benefits of the investment Pink Sand made in promoting her career, which grew her readership and royalty income enormously.  And although she claims that Grishman negotiated a royalty rate below the industry standard, the evidence is undisputed that she

[8] De Vita denies that this conversation occurred.  De Vita Decl. [Dkt # 70-3] ¶¶ 9-10.

[9] Clark's assertion that she raised her concerns to Grishman are contradicted by her prior testimony that she did not.  *See* Clark Aff. Ex. 3 (Clark Dep. Excerpt I) [Dkt # 62-3] at 134.

[10] While Clark states that she did not know whether she had cause to fire Grishman as her agent, Def.'s Opp'n at 5, she did not reach out to a lawyer to discuss the issue, Clark Dep. at 102-103.

accepted a bonus structure proposed as an alternative to a rate increase. *See* Grishman Opp'n Aff. Ex. 2 (Clark Dep. Excerpt II) [Dkt # 70-2] at 100-101; *see also* PA ¶ 5(a)(13) (incorporating the bonus structure Grishman proposed as an alternative to increasing Clark's royalty rates). Finally, despite Clark's complaint that Grishman and Pink Sand improperly used a ghostwriter to complete *Secret Hearts*, it is undisputed that she reviewed and enthusiastically approved De Vita's final version of the *Secret Hearts* manuscript on March 30, 2020. *See* Clark/Grishman Emails [Dkt # 70-7] ("Thanks for giving me a chance to take a peek at [*Secret Hearts*]. I'm looking forward to this going live in April! Let me know when I can start sharing the news on social media."). As the undisputed evidence of ratification is overwhelming, the court will allow summary judgment for plaintiffs on Clark's claim of fiduciary breach.

## V.    Counterclaim II: Breach of the PA for Failure to Pay Royalty Audit Costs

The parties both seek summary judgment on Clark's counterclaim that Pink Sand breached the PA by refusing to reimburse a portion of the cost of an audit of Clark's royalty payments. The audit found that Pink Sand owed Clark $10,368.15 in royalties. Royalty Audit Report [Dkt # 67-4]. Plaintiffs contend that the actual amount at issue is $2,466.55, as Pink Sand had previously (by its estimate) overpaid Clark by $7,901.60. The PA required

that Pink Sand contribute to auditing costs up to the error amount when "errors of accounting in the Publisher's favor amounting to 5% or more of the total sum paid to the Author under th[e Publishing Agreement] are found." PA ¶ 6(b).

Because Counterclaim II does not arise from the same transaction or occurrence that is the subject matter of plaintiffs' claims, it is a permissive counterclaim.  Fed. R. Civ. P. 13(b).   There appear to be no facts tying either Pink Sand's alleged underpayment of Clark's royalties or its refusal to contribute to the auditing costs to the contractual issues that plaintiffs' claims involve.   Clark does not allege that Pink Sand's underpayment of royalties or refusal to pay is related to the parties' underlying dispute about her work product, its timeliness, the withheld royalties, or any events that precipitated this suit.   Neither Clark's answer nor her motion for summary judgment offer any explanation for why this claim arises from the same series of events as plaintiffs' claims.  *See, e.g.*, Def.'s Mem. at 18-19 (arguing that Pink Sand is in breach of the PA under Counterclaim II, but failing to mention royalty underpayment or auditing cost coverage in the brief); Def.'s Statement of Facts (omitting mention of Counterclaim II entirely).

Permissive counterclaims in a diversity action must satisfy the amount-in-controversy requirement to establish federal jurisdiction.

*Iglesias v. Mut. Life. Ins. Co. of N.Y.*, 156 F.3d 237, 241 (1st Cir. 1998) ("Permissive counterclaims, however, do not fall within ancillary jurisdiction and therefore may not be heard in federal court unless supported by an independent basis of jurisdiction.").  Under the PA, even assuming that Pink Sand underpaid the full $10,368.15 originally alleged, Pink Sand would be liable at maximum for $5,150 – the cost of the audit.  *See* Audit Invoice [Dkt # 67-7]; *Coventry Sewage Assocs., Inc. v. Dworkin Realty Co.*, 71 F.3d 1, 4 (1st Cir. 1995) ("[T]he amount in controversy is determined by looking to the circumstances at the time the complaint is filed. . . . [A] court decides the amount in controversy from the face of the complaint unless it appears or is shown that the amount stated in the complaint is not claimed in good faith.") (citations and internal quotations omitted).  Because Clark cannot meet the amount-in-controversy requirement,[11] the court will dismiss this counterclaim.

---

[11] Although Clark states that the amount in controversy exceeds $75,000 in her complaint, she offers no support in the record that this counterclaim meets this requirement.  *See Abdel-Aleem v. OPK Biotech LLC*, 665 F.3d 38, 41-42 (1st Cir. 2012) (holding that a plaintiff's general allegation of damages that meets the amount requirement suffices unless questioned by the court, at which point "the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount."), quoting *Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004).

## VI.   Counterclaim III: Breach of the PA for Withholding Royalties

The parties cross-move for summary judgment on Clark's counterclaim that Pink Sand breached the PA by withholding Clark's quarterly royalties.   A party to a contract is excused from further performance under the contract if the other party commits a material breach. *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006), quoting *Lease-It, Inc. v. Mass. Port. Auth.*, 33 Mass. App. Ct. 391, 397 (1992). Because the court has denied summary judgment on the plaintiffs' claim that Clark breached the PA, the court will also deny summary judgment here, as its resolution depends on the question of Clark's alleged breach.

## VII.   Plaintiffs' Motion for Summary Judgment on Clark's Affirmative Defenses

Plaintiffs seek to dismiss Clark's affirmative defenses of unclean hands, inequitable conduct, laches, waiver, and unconscionability.   The affirmative defenses are matters to be heard by the court in equity on a fully developed record.   The proper vehicle by which to object to an affirmative defense is a motion to strike pursuant to Fed. R. Civ. P. 12(f) and not by way of a motion for summary judgment sounding in law.

**ORDER**

For the foregoing reasons, summary judgment will be <u>ALLOWED</u> in favor of plaintiffs with respect to Count II and Counterclaim I. The court will <u>DISMISS</u> Counterclaim II for lack of jurisdiction. The parties' motions for summary judgment with respect to the remaining claims, counterclaims, and affirmative defenses are <u>DENIED</u>. The Clerk will enter summary judgment on the identified Counts and set the balance of the case for trial.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE